# EXHIBIT "D"

# Mount Joy Borough Police Department
## 21 East Main Street
## Mount Joy, PA 17552

### Use of Force Policy
**Effective Date: October 16, 2007**
**Review Date: October 16, 2008**

**Purpose:**

Police officers, on a daily basis, are frequently presented with situations in which force is required. Reasonable force will range between a low level use of force consisting mainly of the presence of the officer and verbal commands all the way up to and possibly including the use of deadly force. The purpose of this department policy is to provide the officer with guidelines, proscriptions, and limitations on the use of force generally and the use of deadly force in particular.

**Policy:**

It is the policy of the Mount Joy Borough Police Department that its officers will use reasonable force in carrying out their duties and responsibilities as police officers.

**Federal Standards:**

The federal standards are based primarily on three United States Supreme Court decisions which have interpreted and applied the Fourth Amendment to the United States Constitution to the use of force by police officers. The Fourth Amendment provides:

> *The right of the people to be secure in their persons, house, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.*

ATTACHMENT 7
PAGE 374 OF 528

1

The three (3) critical cases are: *Tennessee v. Garner*, 471 U.S. 1 (1985, *Graham v. Connor*, 490 U.S. 386 (1989) and *Brower v. County of Inyo*, 489 U.S. 592 (1989). These cases and what they stand for are part of every officers' Act 120 training and are periodically reviewed in Act 180 Use of Force Update training, as well as elsewhere. In some form they tell us that when a police officer intentionally uses force and actually gains control of a suspect that a seizure has occurred. Deadly force used to seize a non-dangerous, fleeing felony suspect who poses no risk of harm to anyone is prohibited. Deadly force is permitted under *Garner*.

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon to there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, there feasible, some warning has been given. *Id.* 11

The reasonableness of a police officer's use of force will be judged, applying *Graham*, as follows:

> Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, its proper application requires careful attention to the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . ..

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . ..

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

In general, a reasonable police officer is allowed to use his education, training and experience as he goes about in making the decisions which are part and parcel of his duties as a police officer.

ATTACHMENT 7
PAGE 375 OF 528

<u>State Standards</u>:

Pennsylvania Constitution, Article I, § 8

*The people shall be secure in their persons, houses, papers and possessions form unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor. without probable cause, supported by oath or affirmation subscribed to by the affiant.*

The controlling state standard is found in Section 508 of the Pennsylvania Crimes Code. An officer who follows Section 508 is justified in the force used. An officer who does not follow Section 508, thereby using excessive force, is exposed to the filing of criminal charges. Section 508 of the Crimes Code provides as follows:

18 Pa.C.S. § 508 (2003)

§ 508. Use of force in law enforcement.

(a) PEACE OFFICER'S USE OF FORCE IN MAKING ARREST. —

(1)    A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he believes to be necessary to affect the arrest and of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest. However, he is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person, or when he believes both that:

(i)    such force is necessary to prevent the arrest from being defeated by resistance or escape; and

(ii)    the person to be arrested has committed or attempted a forcible felony or is attempting to escape and possesses a deadly weapon, or otherwise indicates that he will endanger human life or inflict serious bodily injury unless arrested without delay.

(2)    A peace officer making an arrest pursuant to an invalid warrant is justified in the use of any force which he would be justified in

ATTACHMENT Z
PAGE 376 OF 528

3

7/24/2012                              413

using if the warrant were valid, unless he knows that the warrant is invalid.

Interactions with Police:

There are three (3) types of interaction with police:

- Mere Encounter:
  --No suspicion required
  --Individual free to leave
  --No force allowed beyond officer presence

- Investigative Detention:
  --Requires "reasonable suspicion"
  --Less lethal force and deadly force are not permitted

- Arrest or Custodial Detention:
  --Requires "probable cause"

- Department Authorized and Supplied Equipment:
  - Hand gun
  - OC Spray
  - Taser
  - ASP- Collapsable Baton
  - PR-24
  - Automobile
  - Handcuffs (2 sets)
  - Flashlight
  - Patrol Rifle
  - Less than lethal Bean-bag rounds for the Shot Gun

The Force Progression:

The generally accepted use of force model is usually as is here presented as a series of progressive force options from lower level of intrusion to ultimately deadly force. Often, this model is illustrated as is here with some type of diagram. The fact is that these force options and any illustrative diagram have certain recognized shortcomings. Each encounter is unique. An officer may be required to use force beginning at any level, depending on the facts of the encounter, and it is recognized that the officer may go from a less to a more intrusive, or from a more intrusive to a less intrusive, option quickly as the events dictate. It is always the suspect's behavior that

ATTACHMENT 7
PAGE 377 OF 528

4

determines the choice or choices that are made. This force continuum presupposes the officer's motor vehicle is stopped and the officer is most likely out of the vehicle. Vehicle operations are discussed separately in a separate policy.

**Step I – Officer Presence:**

The officer assumes control of a situation or suspect through his announced and/or uniformed appearance.

**Step II – Verbal Command:**

Presence has failed.   The officer now begins a verbal persuasion/dialog and, if needed, command/warning mode to take control of the incident.

**Step III – Open Hand:**

Where practical, the officer places hands on the suspect and advises the suspect that he or she is under arrest. All resistance beyond this point is unlawful and must be countered by the officer. This step may lead to a wrestling match. It is also permissible at this step to use either OC Spray or a taser. An officer is permitted to use either OC Spray or a taser if trained and if the officer's training is current.

**Step IV – Pain Compliance:**

This is where officers, where practical, employ increasing levels of pain, such as pressure point controls. Oleo resin capsicum spray, or tasers, may also be used to obtain suspect compliance.

**Step V – Mechanical Compliance:**

The usual methods of mechanical compliance include wristlocks, arm bar, or other "come along" techniques. These are counter joint pressures and leverage may be applied utilizing handcuffs, PR-24, flashlight or the police ASP- collapsable baton.

**Step VI – Impact:**

It is only when mechanical control methods are ineffective or inappropriate that the force applied escalates to the use of an impact weapon. When practical, blows should initially be directed to soft tissue

ATTACHMENT 7
PAGE 378 OF 528

areas, such as the back of the legs or buttocks prior to a strike at a joint or bone. This is the intermediate step between hand-applied force and the ultimate force of firearms.

### Step VII – Less Lethal Force:

This step is where weapons, such as bean bags fired from shot gun shells may be used. Our Department does presently provide less lethal weapons and train in their use. Individual officers who are part of the County SERT Team who receive training in the use provided by the County may use their training and County provided weapons, if authorized, but only in connection with their duties as a SERT Team Member.

### Step VIII – Deadly Force:

This ultimate step is appropriate to protect yourself or another from death or serious bodily injury, or to apprehend a fleeing forcible felon when you have exhausted all other means of apprehension and the suspect presents an eminent risk to the community, if not immediately apprehended.

### The Totality of the Circumstances:

The force is never applied in a vacuum and always takes into consideration the totality of the circumstances.

1. **Suspect Factors:**
   Nature of the Crime
   Age
   Sex
   Size
   Skill Level
   Drugs/Alcohol
   Mental Status
   Disabilities

2. **Officer Factors:**
   Multiple Officers
   Age
   Sex
   Size

ATTACHMENT 7
PAGE 379 OF 528

Skill Level and Force Options

3.      **Special Circumstances:**
        Daylight/Dusk/Night
        Lighting
        Close Proximity to Firearm
        Special Knowledge
        Injury or Exhaustion
        Ground
        Disability
        Imminent Danger
        Ability to Escalate or Disengage

4.      **Number of Suspects**

## Subject Levels of Resistance:

In addition, the subject's level of resistance must help determine any police use of force.

1.      **Passive Resistance:**

The subject uses "dead weight" only to attempt to refuse compliance. They are verbally non-compliant and use body weight to prevent the officer from gaining control. An example of passive resistance would be as depicted outside abortion clinics and protests. The subject makes no attempt to physically harm the officer. Generally, up to use of pain compliance techniques are appropriate for this level of resistance.

2.      **Active Resistance:**

The subject performs some physical act, short of officer assault to prevent subject control by the officer. Running, grabbing an object, intertwining with another subject are all examples of an act of resistance. Generally, up to use of mechanical subject control techniques would be considered appropriate levels of force to overcome this type of resistance.

3.      **Assaultive Resistance:**

The subject employs some sort of grab, push, pull, wrestling or leverage technique designed to unbalance the officer, a strike, a punch, a kick, or any other method that employs a means by which the officer would be assaulted, short of a deadly force threat.

ATTACHMENT 7
PAGE 380 OF 528

Generally, up to use of impact/electrical subject control techniques would be considered appropriate levels of force to overcome this type of resistance.

    4.    **Lethal Resistance:**

The subject uses some type of resistance, either armed or unarmed that puts the officer in fear of death or serious bodily injury. A deadly or lethal force response is appropriate for this type of resistance.

    5.    **Number of Suspects**

## Shooting at or From Moving Vehicles:

Officers shall not discharge a firearm at or from a moving vehicle, with the following exceptions and after considering:

(a)    The difficulty of hitting a moving target.

(b)    Ricocheting bullets strike unintended targets.

(c)    Population density.

(d)    The inability to stop a vehicle's momentum even when the target actor or suspect is hit, and the danger or injury which might result from causing a vehicle to go out of control.

(e)    As a last resort measure when the suspect, by using the vehicle or other means poses an imminent danger of death or serious physical injury to the officer and other person.

(f)    As a last resort to present the escape of a fleeing felon when the use of deadly force is otherwise justified.

## Positional Asphyxia:

To avoid chest compression or a claim that chest compression may have precipitated positional asphyxia, officers shall avoid maintaining control over (or transporting) a prisoner(s) by keeping them in a prone or "hog-tied" position. Once control over a prisoner(s) has been obtained, officers shall place the prisoner(s) in a seated position, or if necessary, on their side.

ATTACHMENT 7
PAGE 38/ OF 528

<u>Notification and Reporting Requirements for Use of Force Incidents</u>:

(a)     <u>Use of Force Report</u>:

1. Officers of the Mount Joy Borough Police Department shall complete a "Departmental Use of Force Report" (Addendum A) whenever they:

(a) Discharge a firearm for other than training or recreational purposes:

(i) Exceptions:

(a)     Firearm discharges for the destruction of an animal shall be documented by a Departmental Incident Report.

(b)     Take an action that results in, or is alleged to have resulted in, injury to or the death of another person.

(c)     Apply Step 3 force relating to the discharge of oleoresin capsicum or a taser, or force in excess of that defined by Step 4 within this policy.

2.     A "Use of Force" Report generally shall be completed prior to the officer(s) concluding their shift during which the use of force occurred.  The completed report(s) shall be provided to the Shift Supervisor (OIC) to be forwarded through the chain of command to the Chief of Police.  If no injury was apparent, but later alleged, a "use of force" report shall be completed at that time.

(a)     If the officer involved is injured or unable to make the report, the officer's supervisor should submit a written report prior to the end of the shift in which the incident occurred detailing the circumstances under which the officer is unable to submit the report.

<u>Medical Attention Required Following Use of Force as Appropriate</u>:

General rule:

Officers shall arrange for an emergency medical service (EMS) to examine, treat and/or transport to a medical facility a subject if:

(1) The force utilized by police personnel caused more than superficial injuries.

Medical treatment of oleoresin capsicum contaminated persons is needed:

ATTACHMENT 7
PAGE 382 OF 528

9

(1) As soon as possible, persons contaminated by a release of oleoresin capsicum shall be exposed to fresh air and have their contaminated areas flushed with cold water.

(2) Contact lenses of contaminated persons shall be removed and thoroughly washed prior to reuse.

Evaluation by medical personnel (EMS) shall be initiated without delay in any of the following circumstances:

(1)     Any person who has been exposed to oleo resin capsicum who complains of itching, hives, difficulty swallowing, facial swelling (particularly around the eyes, lips or nose) or who states they have a known allergy to any of a variety of pepper.

(2)     Any person who admits to being under the influence of cocaine, amphetamines, barbiturates, PCP, opium, heroin, or high levels of alcohol.

(3)     Any person who admits a history of heart problems, lung problems, diabetes, high blood pressure, or other potentially serious medical condition.

Medical treatment of a person on whom a taser was used:

(1)     Once the subject is safely secured and in custody, the arresting officer shall notify EMS that the subject has received an electrical charge from the taser and relate the appropriate time the action occurred. If the probes penetrate the skin, the puncture site shall be brought to the attention of medical personnel.

(2)     Only medical personnel may move, or direct to be removed, any taser probes that are embedded in soft tissue areas, such as the neck, face and groin. The removal from other areas will be at the discretion of the on-scene officer, supervisor or medical personnel.

(3)     The on-scene supervisor, if available, or other officer shall allow medical personnel to determine if the subject should be transported to the hospital.



ATTACHMENT 7
PAGE 383 OF 528

(4)   If the probes are no longer affixed to the subject, and medical personnel determined the subject does not need to be transported to the emergency room/hospital, the subject may be transported to jail.

(5)   If the subject is transported to the emergency room/hospital, the transporting officer shall obtain a medical release from medical personnel before the subject is transported to jail.

(6)   Officers must be aware that one aspect of possible injury to a subject receiving an electrical charge from a taser is that of falling from a standing position.

(7)   The spent air cartridge and probe shall be collected and preserved as evidence.   Caution should be exercised in handling probes that have penetrated a subject's skin.  Such probes shall be packaged and handled with the same care as a hypodermic needle, and shall be packaged in a suitable container to prevent accident infection.  The probe shall be labeled as a biohazard when submitted as evidence.

(8)   The deploying officer is responsible for documenting the deployment of the taser by completing the Use of Force Report in detail.

(9)   The officer deploying the taser shall insure photographs are taken of the subject receiving an electrical charge from the taser (contact or probes), with special attention to any area injured and where the charge was received. The officer shall include detailed documentation in the incident report as to how the injury occurred.

## Vehicle Operation/Pursuit:

75 Pa. C.S.A. § 6342 was enacted for the purpose of directing police departments to maintain pursuit policies and to provide the outline of the content that must be included in the policy.   The Mount Joy Borough Police Department has a separate vehicle operations policy, which you as an officer are responsible for reading, understanding and following.

## Oleoresin Capsicun Spray (O.C. Spray):

## Definitions:

1.   Oleoresin Capsicum (OC) – A derivative of cayenne pepper, OC is classified as an inflammatory. OC exposure generally has the following characteristics

ATTACHMENT 7
PAGE 384 OF 528

11

    (i)     works immediately
    (ii)    symptomatic effects may last up to 45 minutes
    (iii)   There are no documented long lasting harmful effects to the person
          who is sprayed with OC.

2. **Non-Flammable Propellant** – a propellant or delivery system that will not enhance open flames or causes a fire from a spark.

**Departmentally approved OC sprays:**

Generally –
Officers may only carry and use OC Spray issued by the Chief of Police or his designee. OC spray from any other source, regardless of its composition or manufacturer, may not be used or carried.

A. Officers shall not carry OC products containing unreasonably flammable substances. (e.g. alcohol)
B. Officers shall not carry OC products containing known carcinogens.
C. Officers shall not carry OC products containing substances banned by the United States Environmental Protection Agency.

**Training:**

Officers must be trained and must successfully complete a departmentally approved OC training program prior to being issued OC.

**Guidelines for Usage:**

A. Oleoresin Capsicum Spray (O.C. Spray) should be used at distances of less than ten (10) feet. The effectiveness increases with close proximity. Short bursts are more effective than prolonged spray. Also O.C. Spray should be sprayed directly into the subject's face, primarily the eyes, nose and mouth. This tool may also be used against attacking dogs, again spraying the area of the eyes, nose and mouth.

B. The duration of the application of chemical agents shall be limited to the absolute minimum required to effectively control the subject. Normally, short one-half-second (1/2-second) bursts are sufficient; bursts of longer duration seldom increase effectiveness, but increase the possibility of injury.

ATTACHMENT 7
PAGE 386 OF 528

C. O.C. Spray has been found to be effective against most drug abusers and persons under the influence of alcohol.

D. Subjects upon whom a chemical agent is used must exhibit apparent signs of being alert and in possession of their normal reflexes; i.e., blinking, eye closure, breath holding, or turning away from the applied stream.

E. The agent will not be employed in the immediate vicinity of infants, since their respiratory systems are extremely sensitive to all kinds of vapors.

**Effects of OC usage:**

The general effects of OC exposure include inflammation of the eyes and mucous membranes causing an involuntary closing of the eyes and uncontrollable coughing/hacking. The effects are immediate and render the person helpless through temporary blindness.

**Straight/Side Handle Batons (ASP and PR-24):**

Officers to defend themselves or others may utilize these intermediate defensive weapons. The primary purpose of these weapons is to provide officers with a means of fending off and/or subduing an unarmed assailant.

A. Officers should not rely on these types of weapons to overcome an armed attack.

B. Officers may have to rely on these weapons to subdue a violently resisting subject; however, officers must realize that blows delivered to the head with the straight/side handle baton could prove fatal. Blows delivered to other vulnerable areas are often more effective.

C. These weapons will not be used to strike handcuffed individuals, properly secured and in custody, nor as a threatening device to intimidate people.

D. All officers will be trained and be able to demonstrate satisfactory skill, proficiency, and if needed proper qualification, prior to carrying or using the straight/side handle baton by a certified instructor. Subsequent to training and certification, the side handle baton can be carried instead of the conventional baton. If remedial training is needed by an officer, the certified instructor shall provide one-on-one training with the officer until the officer can show proficiency, and if needed proper qualification.

ATTACHMENT 7
PAGE 386 OF 528

13

E. Batons shall be carried or stored in an easily accessible location should the officer need it quickly when exiting a patrol vehicle.

**Handgun:**

The Chief of Police, or his designee, shall maintain an official record on each authorized weapon owned by the Department and issued to each officer for official use. The Chief of Police, or his designee, shall also maintain an official record of all personal weapons authorized by the Department for official use, and the Chief of Police, or his designee, shall be responsible for updating these records.

1. Updating of the Firearm record shall be done annually, and during the firearm training session. Firearm Instructors shall document all firearm inspections and a listing of the firearm information shall be forwarded to the chief of police. This department will keep information on all firearms; at no time will the department expunge firearm information.

2. While on duty, officers will carry a weapon issued by the Department and capable of firing Department-issued ammunition. Unless otherwise authorized, that weapon shall be the issued weapon of the officer.

3. All officers will be required to undergo at least an annual firearm qualification with their issued service weapon, unless excused for just cause by the Police Chief.

4. Unauthorized persons shall secure all Department-issued or authorized firearms kept away from Department property so as to foil accidental discharge, theft, or use.

5. The standard issued firearm of the department will be the Beretta, model Px4 Storm, and .40 caliber semi-automatic pistol.

6. The department shall issue duty ammunition.

7. While off duty, officers are not authorized to carry weapons as outlined above under the following conditions:

    A. To, from, or while attending preplanned social functions that will involve the consumption of any intoxicating substances. Officers who, without preplanning, find themselves in a situation where intoxicating substances are being served will refrain from use of such substances.

ATTACHMENT _7_
PAGE _387_ OF _528_

B. While engaged in a recreational activity or physical labor that could pose a threat of the weapon being exposed, dropped, accidentally discharged, or prove to be a threat to the officer or other persons or property.

8. It is recommended that prior to carrying an off-duty weapon, the officer should qualify with that weapon and provide to an authorized Mount Joy Borough Police Department Firearms Instructor the make of weapon, caliber of weapon, length of barrel, type of finish, and serial number of that weapon.

9. Officers will qualify the first qualification of each year with their off-duty weapon(s). Firearm Instructors can disqualify any officer who fails to meet the standards set for each qualification course if the weapon is operationally unsound.

10. The cost of ammunition to qualify with personally owned weapons shall be assumed by the individual officer.

11. While carrying a firearm off-duty, officers will always have on their person the issued Department and/or State Identification and badge of authority. All officers shall take all reasonable care to see that their weapon remains totally concealed while in public, unless it is required for lawful use.

12. The maximum number of off-duty weapons that an officer will be allowed to qualify with is two, unless prior approval has been received from the Chief of Police or his designee.

13. Special on duty assignments - Off-duty or secondary weapons and ammunition, authorized by the department, may be utilized or assigned for special on-duty related details or assignments as given and authorized by Chief of Police

## Shotguns:

The department shall no longer use the shotgun for the use of 00-Buck Ronds and Hi Shock Slugs. The department shall use the shotguns for discharging less than lethal beanbag rounds.

1. All uniformed officers will have a shotgun in their vehicle prior to assuming active patrol status.

ATTACHMENT 7
PAGE 388 OF 528

2. Shotguns will be secured in approved gun racks in the vehicle when on patrol.

3. Each officer will be required to qualify with the shotgun at least annually.

4. Department Firearms Instructors will develop a shotgun maintenance schedule for cleaning and detailed inspection of each shotgun. Range masters shall ensure the schedule is adhered to.

5. When loading the shotgun, ensure the weapon is loaded properly to capacity; however, do not under any circumstance pump live rounds into the chamber when securing the weapon into the vehicle.(Cruiser Safe)

6. When loading and unloading shotguns, be sure the weapon is pointed in a safe direction.

### Police Patrol Rifle:

The Police Patrol Rifle (PPR) may be used to assist officers who respond, or become involved, in an unplanned or spontaneous incident involving a suspect(s) who is wearing protective body armor, or believed to be armed with or has immediate access to firearms, or is believed to be armed and situated in a distant or fortified position or location, or where the officer has a reasonable expectation that there is a clear potential for an armed suspect encounter. The use of the PPR is intended to minimize or prevent the risk of death or serious bodily injury to officers as well as members of the community.

1. Though deployment of the PPR is usually restricted to spontaneous events, the Officer in Charge (OIC) may authorize its deployment on a pre-planned basis for high-risk events or operations.

2. In every case, deployment of the PPR shall be in accordance with the general firearm policy, safety rules and procedures and the use of force guidelines and regulations set forth within this policy.

3. Police officers of the Mount Joy Borough Police Department will be authorized to use the rifle(s) owned by the Mount Joy Borough Police Department during performance of their official duties. The usage of the rifle(s) by members of the Mount Joy Borough Police Department will be restricted to trained personnel only.

4. To qualify as trained personnel in the use of the patrol rifle owned by the Mount Joy Borough Police Department, police officers will have to meet the

16

ATTACHMENT 7
PAGE 389 OF 528

minimum standards for qualification as recommended by the National Rifle Association (NRA) and the Municipal Officers Education and Training Commission (MPOETC).

5. Officers trained with the patrol rifle will be required to re-qualify and train with the patrol rifle annually (minimum standard).

6. Officers will be required to shoot a minimum proficiency of 90% to qualify with the patrol rifle utilizing the course of fire used by the Mount Joy Borough Police Department.

7. All patrol rifles owned by Mount Joy Borough Police Department will be re-sighted for accuracy by a qualified Mount Joy Borough Police Department Firearms instructor annually.

EXCEPTION: Any Mount Joy Borough police officer assigned to the Lancaster County Special Emergency Response Team (SERT) may utilize his assigned Patrol Rifle for the same conditions outlined in this policy during his course of duties with the Mount Joy Borough Police Department. Training and qualification standards through the Lancaster County SERT team will be considered adequate to fulfill the requirements set forth for the Mount Joy Borough Police Department.

**FIREARMS, AMMUNITION AND EQUIPMENT.** The following additional procedures are to be observed.

1. Handling of Firearms - All officers are expected to maintain their proficiency with regard to the safe handling and use of firearms. The playful or wanton pointing of a firearm at anyone or the careless or negligent use of a firearm is prohibited.

2. Carrying of Firearms - While on duty, officers are to carry only those weapons as issued by, or approved by the Mount Joy Borough Police Department.

   a. Care and Maintenance.

      (1) Firearms shall be maintained in clean, rust free, and fully serviceable condition at all times.

      (2) The Department Range Masters will authorize all service work on Department-issued weapons.

ATTACHMENT 7
PAGE 890 OF 528

(3) Department-issued weapons will not be disassembled except for "Field stripping" of the weapon in compliance with guidelines set forth by Department Firearms Instructors.

b. Alterations and Accessories.  Alterations and accessories to issued weapons require prior approval of the Chief of Police.

c. Ammunition.

(1) Only ammunition issued by, or approved by the Department, will be carried on duty.

(2) A minimum of three fully loaded magazines for uniformed officers and at least one fully loaded magazine for plainclothes officers is required.

(3) Extra ammunition is to be carried by all officers and shall also be available in all Borough vehicles utilized by sworn members of the Department.

(4) All types of ammunition used for training, on-duty purposes when utilizing a weapon qualified by the department, is restricted to that authorized by the Chief of Police.

d. Holsters, Ammunition Holders and Ammunition Loaders.

(1) While on duty, only those holsters, ammunition holders, and ammunition issued by, or approved by the Department shall be used.

(2) While off duty, weapons shall be carried in holsters of good quality, equipped with a safety strap, locking mechanism or other means of firearm security or retention.

e. Firearms Qualification - To meet the responsibilities to the public and adhere to any and all laws and regulations as set forth, a firm policy has been established regarding firearms training and qualifications.

(1) All officers will be required to undergo several regularly scheduled firearms safety training and firing sessions per year.

ATTACHMENT 7
PAGE 391 OF 528

(2) Officers who have not displayed minimal competency with their weapon will not be authorized by the Mount Joy Borough Police Department to carry firearms.

(3) Qualification Requirements.

(a) In order to qualify to carry a police sidearm, each officer is to complete a qualification course annually by obtaining a passing score on the applicable state qualification firearms course or courses. During each qualification session, the complete course shall be fired a minimum of one time.

(b) All officers will be required to fire the police shotgun at least annually to familiarize themselves with the weapon. Such firings will be under the supervision of a Department Firearms Instructor.

(c) All officers may fire any and all Department-approved off-duty weapons annually under the supervision of a Department Firearms Instructor.

(d) Any officer who fails to achieve a minimum passing score on a required qualification course shall attend additional firearms training at no expense to the Borough within 30 days of the qualification attempt.

1) Upon completion of such additional instruction, the officer shall re-shoot for qualification under the supervision of a Department Firearms Instructor until the course has been passed.

2) Consideration will be given to those officers who cannot fire a qualifying score due to a medical/handicap. If such condition/handicap is permanent, a determination will be made as to whether the officer can continue in an active duty capacity. If such condition/handicap is temporary a determination will be made as to whether the officer should be removed from active duty or reassigned to duties not requiring carrying of a firearm until recovery and successful completion of the required qualification course. Not being able to qualify with an issued weapon after additional instruction is reason for dismissal.

ATTACHMENT 7
PAGE 392 OF 528

19

(e) Officers are to attend all scheduled training and qualification sessions as assigned.

(f) Department Firearms Instructors will forward qualification scores and training results to the Chief of Police upon completion of each qualification period.

(4) Department officers as issued through the National Rifle Association (NRA) may wear police Marksmanship Badges.

(a) Classification of award will be determined by either averaging all scores fired during the previous three (3) years of firing of using the highest score obtained during an Annual Department Shooting Match, whichever is higher.

(b) The Department Firearms Instructor shall maintain the above records and furnish the information to officers upon request.

3. Discharge Reporting Procedures.

a. When an officer has discharged a firearm, whether on of off duty, in any and all circumstances other than while actively engaged in legal sporting events of competitive or practice type target firing, or routine training, the officer shall adhere to the following procedures:

(1) Make a verbal report to the Chief of Police or the Officer-in-Charge.

(2) Complete and furnish to the Chief of Police or the Officer-in-Charge a "Use of Force Report" containing a detailed report of the incident as soon as possible following the incident.

(3) In the event the officer who has discharged firearm is fatally injured or is physically or mentally incapacitated and is incapable of submitting the "Use of Force Report"; the officer's immediate supervisor is responsible for completing the report.

b. A complete and thorough investigation into the incident will be made as soon as possible following the incident.

c. At no time during performance of duty shall an officer fire "warning shots".

ATTACHMENT 7
PAGE 393 OF 528

    d. A rescue shot identifies a location and signals for appropriate assistance. Officers in danger of death or serious physical injury and incapacitated to the extent they cannot signal in any other manner, may fire a rescue shot. Officers must exercise reasonable care in firing rescue shots, e.g., by shooting away from any other individuals, homes, vehicles, etc.

4. Destruction of Animals.

    a. An officer may use a firearm to dispatch a dangerous animal or terminate the suffering of a critically injured or sick animal when other means of disposal are impractical.

    b. In all cases when the shooting of an animal is necessary, the officer will ensure the protection of nearby persons and property.

    c. Officers are required to complete an Incident Report when a firearm is used to dispatch an animal.

5. Post-Shooting Incident Procedures & Other Deadly Force Incident Procedures

    a. Handling of Officers at Scene of Shooting Incident or other deadly force incident.

        (1) A supervisor shall be dispatched to the scene of the incident, and shall assume primary responsibility in caring for involved personnel.

        (2) The supervisor shall make appropriate arrangements for all necessary medical treatment.

        (3) During any period where the involved officer is required to remain on the scene, but has no immediate duties to fulfill, the officer should be taken to a quiet area away from the scene of the incident. A peer counselor or other supportive friend or officer should remain with the officers, but should be advised not to discuss details of the incident.

        (4) The supervisor should arrange for the officers directly involved in the incident to leave the scene as soon as possible, and be taken to a quiet, secure setting.

ATTACHMENT 7
PAGE 394 OF 528

(5) Where possible, the supervisor shall briefly meet with the involved officers.

    (a) No caffeine or other stimulants or depressants should be given to the officers unless administered by medical personnel.

    (b) Only minimal, preliminary questions should be asked about the incident. The officers should be advised that a more detailed debriefing would be conducted at a later time.

    (c) Any standard investigations that will occur concerning the incident should be discussed with the officers.

    (d) The officers should be advised that they may seek legal counsel.

    (e) The officers should be advised not to discuss the incident with anyone except a personal or agency attorney, union representative, or departmental investigator, until the conclusion of the preliminary investigation.

(6) The supervisor shall determine whether the circumstances of the incident require that the officer's duty weapon be taken for laboratory analysis. Where the duty weapon is taken, the supervisor shall:

    (a) Take custody of the officer's weapon in a discrete manner; and

    (b) Replace it with another weapon, or advise the officer that it will be returned or replaced at a later time, as appropriate.

(7) Involved officers should notify their families about the incident as soon as possible. Where an officer is unable to do so, an agency official shall personally notify his family, and arrange for their transportation to the hospital.

(8) At all times, when at the scene of the incident, the supervisor should handle the officer and all involved personnel in a manner that acknowledges the stress caused by the incident.

b. Post-Incident Procedures

ATTACHMENT 7
PAGE 395 OF 528

(1) Involved personnel shall be removed from line duties pending evaluation but shall remain available for any necessary administrative investigations.

(2) All officers directly involved in the shooting incident or any incident involving death or serious bodily injury shall be required to contact an agency designated specialist for counseling and evaluation as soon as practical after the incident. Involved support personnel should also be encouraged to contact such specialists after a shooting incident. After the counseling sessions, the specialist shall advise the agency:

(a) Whether it would be in the officers' best interest to be placed on administrative leave and for how long;

(b) Where the officers were relieved of their duty weapons after an incident, at what point they should be returned;

(c) What will be the best-continued course of counseling?

(3) The agency strongly encourages the families of the involved officers to take advantage of available counseling services.

(4) Any agency investigation of the incident shall be conducted as soon and as quickly as practical.

(5) The agency should brief other agency members concerning the incident so that rumors are kept to a minimum. Agency members are encouraged to show the involved officers their concern.

(6) All personnel involved in a shooting incident should be advised that they are not permitted to speak with the media about the incident. Officers shall refer inquiries from the media to a designated agency spokesperson, unless otherwise authorized to release a statement pertaining to the incident.

(7) In order to protect against crank or abusive calls, officers should be advised to have phone calls answered by another person for several days if their names are released to the public.

(8) Officers directly involved in the shooting incident shall be required to re-qualify as soon as practical.

ATTACHMENT 7
PAGE 396 OF 528

c.   Daily Stress Recognition

(1) As post-traumatic stress disorders may not arise immediately, or the officers may attempt to hide the problem, each supervisor is responsible for monitoring the behavior of unit members for symptoms of the disorder.

(2) A supervisor may order an officer to seek assistance or counseling from a mental health specialist upon a reasonable belief that stress may be disrupting the officer's job performance.

d.  Training

(1) The agency shall provide employees with training pertaining to post-traumatic stress disorders and the uniform procedures contained in this policy on a regular basis.

(2) Supervisors are responsible for making available to their unit member's information about the agency's peer counseling group and mental health services.

(3) A Use of Force continuum is a teaching tool used by police agencies to train officers what would be considered by experienced officers as a reasonable amount of force. It is not a concrete directive that dictates a level of force that an officer must use during certain circumstances. Mount Joy Borough police officers are expected to use a reasonable amount of force. Whether the force a police officer uses is reasonable depends on all the facts and circumstances of the event.

**Handcuffs:**

Uniformed officer shall carry at least two pair of handcuffs issued to and approve by the department while on duty. Each situation is different and officers are responsible for their personal safety and ensuring against escape of the detainee. At no time will an officer be handcuffed to a prisoner.

John R. O'Connell Jr.
Chief of Police
Mount Joy Borough Police Department

ATTACHMENT 7
PAGE 397 OF 528



# CONFRONTATIONAL FORCE CONTINUUM

O
F
F
E
N
D
E
R

A
C
T
I
O
N

Totality of Circumstances

1. Officer – Subject Factors

   Age
   Sex
   Size
   Skill Level
   Multiple Officers or Subjects

2. Special Circumstances

   Close Proximity
   Special Knowledge
   Injury or Exhaustion
   Ground
   Imminent Danger

Officer Presence

Verbal Command

Open Hand Submission

Pain Compliance

Mechanical Compliance

Impact

(Less Lethal)

Deadly Force

O F F I C E R   R E A C T I O N

ABILITY TO ESCALATE OR DISENGAGE IS IMPERATIVE

## FORCED OPTIONS

1. FORCE — GOAL IS CONTROL

2. EXCESSIVE FORCE = CONTROL + 1

3. FORCE NEED NOT BE THE LEAST INTRUSIVE BUT MUST ALWAYS BE REASONABLE

4. NOT 50/50 – NEED ADVANTAGE FOR CONTROL

© 2004 R. H. Traenkle

ATTACHMENT 7
PAGE 398 OF 522